THE STATE v. FRANCIS T. BALL, Appellant.—14 S. W. (2d) 638.

Division Two, March 2, 1929.

*Greensfelder, Rosenberger & Grand, Carter M. Buford* and *O. M. Munger* for appellant.

1174

*Stratton Shartel,* Attorney-General, and *Claud E. Curtis,* Special Assistant Attorney-General, for respondent.

HENWOOD, C.—An information was filed in the Circuit Court of Jefferson County by which defendant, Roy Schooley, F. L. Smith, Fred Weingaertner, and three other men, under the fictitious names of John Doe, Richard Roe and Henry Roe, were jointly charged with the robbery of a bank, or robbery in the first degree. Defendant took a severance, and was granted a change of venue to the Circuit Court of Reynolds County. Upon trial in that court, he was found guilty, and sentenced to imprisonment in the penitentiary for eight years. From the judgment and sentence, he has perfected this appeal.

The statements of the evidence contained in the briefs of appellant and respondent are substantially the same. With some alterations, omissions and additions of our own, respondent's statement reads as follows:

"Evidence offered by the State tends to show that about 11:30 A. M., September 24, 1926, defendant went into the Citizens Bank of Festus, at Festus, Missouri, and inquired as to the residence of the Martin family, whom, he said, he wanted to see for the purpose of buying some second-hand Ford cars. He remained in the bank four or five minutes while the cashier made an unsuccessful attempt to reach the Martin residence by telephone. He gave the cashier a business card of one William Mack, an automobile salesman of St. Louis, but the cashier did not remember whether defendant said that Mack came to Festus with him.

"About 11:30 A. M., September 25, 1926, while several people were in the bank, three men came in and robbed the bank. When these three men came into the bank, one of them stopped in the lobby, and the other two went back through the lobby into the directors' room and back around into the banking room, where the cashier was. One of the men told the cashier and his assistant to lie down on the floor, which order they immediately obeyed. The man who remained in the lobby compelled the people there to lie down on the floor. After the robbers, by the use of pistols, had caused the cashier and the assistant to lie down on the floor, they took about eight thousand dollars in money and eighteen thousand dollars in United States Government bonds, this being all the money in the bank except five hundred dollars in currency and twenty dollars in nickels. They also took a pistol which belonged to the cashier, and took money from the counter, among which were five new silver dollars. They also took a tin box with twelve hundred dollars worth of bonds in it, which bonds belonged to a customer of the bank. They put this money in a sack and jumped into an automobile, which was waiting for them near the bank, and left. These three men and another man, four in all, got into the automobile. The cashier then called the telephone operator and told her about the robbery, and she turned on the fire alarm. The cashier went to House Springs, which was about twenty miles

from Festus, about four o'clock the same afternoon; there he saw Roy Schooley, the defendant Ball, Fred Weingaertner, and F. L. Smith. All of the bonds and all of the money, except $4700, were later recovered and returned to the bank.

"Roger Elliott testified that he was in the bank at the time of the robbery; that he went to the cashier's window to get a check cashed, and the cashier took his check and started to cash it when three men came into the bank. One man went to the witness and the other two men went to the president's office and back behind the cages. The man who went to the witness held a revolver in his hands; he told Elliott to lie down. This man was Roy Schooley. The witness lay down on the floor, and in a little while the three men went out; two of them were carrying a sack. These men got in a green Nash car which had on it Ohio license plates. He saw four men get into the car, and the man whom he later identified as Schooley got into the back seat. The witness went to the defendant's club house, near House Springs, that evening after the robbery, and there saw Schooley. He also saw the Nash car that the robbers got in after the robbery. No license plates were on it; the eyelets of the license plates, however, were on the car.

"It further appeared that three men at Antonia, a short distance from Festus, were notified of the robbery, and they got into a car and started on the road from Antonia to House Springs. One of these men, Edward Staat, was a deputy sheriff. They saw a Nash car ahead of them. These men exchanged a few shots with the occupants of the Nash car. A few minutes later the Nash car had a collision with another car, and at this time a few more shots were exchanged. Roy Schooley, who was in the Nash car, was doing the shooting from that car. These men drove to the club house near House Springs, and saw there the defendant Francis T. Ball. Ball told them someone had left a car down there, and that 'they took our skiff and crossed the river.' The car which had been left had bullet holes in it. Ball further told these men that when he saw some fellows taking his boat across the river he 'hollowed' at them and they drew a gun on him and told him to go back into the house. The Nash car was found in a field near the club house. A Moon car was also found stuck in the road near the Nash car; the latter car belonged to the defendant Ball. When these men, who were following the Nash car, found it near the club house, the defendant Ball reached into the Nash car and took out a tin box and gave it to them. This box was found to contain the bonds which had been stolen from the customer at the bank. When these men got to the club house, they asked Schooley how he happened to be there, and he said he came down with Ball and Weingaertner Friday night before the robbery.

"On the morning after the robbery, some of the money which had been taken from the bank was found in a gunny sack about two

hundred yards from the club house. Three pistols and a sawed-off shotgun were also found near the club house. These pistols and this shotgun were exhibited at the trial and the cashier identified one of these pistols as his pistol, which was taken from the bank by the robbers.

"It was shown that on Thursday, the 23rd day of September, 1926, a garage man at House Springs, Missouri, had put a red patch on the tube of the left rear tire of a Nash car and that Roy Schooley was in this car. And there was further evidence to show that the Nash car which was found near the club house, after the robbery, had an inner tube in the left rear tire with a red patch on it.

"The Sheriff of Jefferson County and one of his deputies testified that, on the day of the robbery, they went to the club house near House Springs, and found there the defendant Ball, Roy Schooley, Fred Weingaertner, Mrs. Fred Weingaertner and Mrs. Francis Ball. When they got there they met Ball, who told them he had started to tell a Mr. Boemler that someone had stolen his boat and crossed the river, and he said that someone drove up in a Nash car, and that, when he heard a noise, he walked out of the club house on the porch, and a man said to him, 'Get your head back or I'll blow your head off.' He also said that Schooley came out with him Friday night; later, however, after he was arrested, he said Schooley did not come with him Friday night.

"The cashier testified that, sometime after the robbery, he saw the man who held a pistol on him at the time of the robbery, and that his name is Harry Huffendieck.

"The Prosecuting Attorney of Jefferson County testified that the man who had been charged as John Doe in the information was in reality Harry Huffendieck.

"F. L. Smith, one of the defendants whose case was dismissed, testified that he lived in St. Louis, and was working for the Terminal Railroad Association; that he had known Roy Schooley two years, and the defendant Ball about a year; that he had known a man by the name of Allen for about a year; that he knew Harry Huffendieck, but had never seen him until September 25, 1926; on the 24th of September, 1926, he saw Roy Schooley, the defendant Ball and Allen in Schooley's office at Wellston, Missouri; that a conversation took place there on that date, and Schooley said 'they were going to pull a job, and they were wanting someone to go down and see about it;' that Allen said, 'I have got a car if somebody will furnish the gasoline;' that the defendant Ball said, 'I will furnish the gas;' that Ball or Allen said, 'We will go down and look it over;' that Ball and Allen then went over to a garage, and witness got on a street car and went home; that, about eight o'clock that evening, Allen came by witness's house and said, 'We have obtained a couple of men, and you meet us at the garage in the morning at six o'clock;' that the

next morning, September 25, 1926, he (witness) arrived at Cutie's garage, the appointed place for meeting, about six o'clock; that Harry Huffendieck met him there; that they went to Schooley's house, and Schooley came out and got in the car with them, and they then drove over on Olive Street road, where they picked up two men called Allen and Ernie; that they then went down through the country to the club house of the defendant; that the witness got out of the car and walked from the entrance to the club house, and the other men went back the same way they had come; that he went to the club house and met the defendant Ball; that Ball said, 'My car is stuck up there and we will go up and see if we can get it out;' that Ball further said, 'I want to get this car out and get up to the store and see if there is any message comes in, I want to go and meet them, which ever way they are coming;' that they waited there until about noon because they couldn't get the car out of the mud, at which time the Nash car, in which he had ridden from St. Louis, came back; that Schooley, Ernie and Allen got out of the car; that Schooley said, 'They are after us and have been shooting at us;' that Allen had a sack on his back, and that they all went up toward the river; that the Nash car stopped about thirty-five or forty feet from Ball's car; that after the Nash car stopped and these men got out, the witness and Ball went to the club house; that, after the other men went away, Ball and Schooley came back, and Ball said to the witness, 'All you have got to do is lay low;' that he saw Ball with a tin box under his arm; that defendant said bonds were in the box; that Ball took the box and left it in the Nash car; that the defendant told the witness to go to the sack of money and get some money for himself; that, when he started in that direction, he saw a man coming from the road towards the club house, and it looked as if this man had a gun on his shoulder; that he told Ball about this and Ball said he would go up and see who it was; that Ball and Schooley left together, and, when Ball came back, he said, 'I have got it fixed; that was a deputy sheriff, and I told him that they had crossed the river and that throwed them off, and they have gone toward Eureka. Everything is all right, and all we have got to do is to lay low and go to town when it gets dark;' that the witness then hid in some high weeds; that some man came up, and that he could see the defendant Ball pointing toward him; that he then went to the club house, and was arrested by the sheriff; that when the sheriff asked the defendant if he knew the witness, Ball said, 'I never saw the man in my life before until to-day;' that Schooley also denied knowing him; that he heard a conversation between Schooley and Ball about the license plates on the Nash car, and that Schooley said to Ball, 'Did you get the license off of the car?' and Ball answered, 'I did, and they are in the river.' He further said that he decided to testify against Ball and Schooley because the officers told him Ball and Schooley 'laid it all onto' him.

"On cross-examination, he said Schooley told him that he would pay him a good month's wages to help out on this job, and that he realized that they were going to violate the law. He admitted that he had served time in the penitentiary for the crime of forgery. He also said that the man he knew as Allen, who was in the Nash car, was called 'Mac' by the other men in the car. On further cross-examination, Smith testified that, when the defendant and Schooley and Allen were planning the robbery in question, Allen said, 'Someone will have to go over and look the jug over; I have got a car and somebody will have to furnish the gasoline;' that Schooley, Allen, Harry and Ernie got out of the Nash car when it returned to the club house about noon, and one of them had a shotgun; also, that Allen, Harry, Schooley and defendant went down to the river, and only Schooley and defendant came back.

"On re-direct examination, in referring to the above statement by Allen, the witness was permitted to testify that the use of the word 'jug' meant bank. He also said that, when he and Ball were in the same cells together in jail, the defendant said to him, 'If you have got any money planted down at the club house, tell me where it is, as I am going to get out.'

"The defense was in the nature of an alibi. One witness testified that he lived near House Springs, where the defendant's club house was located, and that he saw the defendant Ball on the morning of September 25, 1926; that Ball and Fred Weingaertner, the defendant's brother-in-law, were going towards House Springs about 10:30 that morning; that they were driving a Moon car. This witness further stated that these men and their wives stayed at the defendant's club house nearly every week end. He further stated that they came to his place on the morning of the 25th of September to get some eggs and some chickens, and that they said they were going to House Springs; that they went toward House Springs and came back by about 11:30. They got their eggs and said that their Moon car was stuck in the mud.

"Another witness, who ran a store at House Springs, testified that he saw Ball and Weingaertner at his store on the morning of the robbery at about ten o'clock, and that defendant placed a telephone call at that time. Another witness testified that on Friday morning, September 24, 1926, when he went to defendant's office about 9:30 o'clock, the defendant was there, and that Roy Schooley was there about twelve o'clock. Another witness said that he went to Ball's office about eleven o'clock on the morning of September 24, 1926, and collected some insurance premiums from the defendant. Other witnesses testified that the defendant Ball and Weingaertner were not among the men who robbed the bank.

"Mrs. Moss testified that she was in the bank when it was robbed, and that Smith was the robber who stayed in the lobby of the bank;

that she later went to the club house near House Springs, and recognized Smith as one of the men in the robbery; that she did not see defendant Ball in the bank.

"A nurse in St. Louis testified that she had been to the defendant's club house the week before the robbery and had been invited to go back the next Saturday, the day of the robbery.

"Dr. Dorothy Martin, a dentist, testified that she and defendant and Schooley occupied the same suite of offices over the Wellston Trust Company, and that, for sometime prior to this robbery, she had been taking care of their business when they were out of the office; that on Thursday morning, September 23, 1926, defendant Ball went out with a Mr. William Mack; that F. L. Smith was not there that morning, but he was there Thursday night between 7:30 and eight o'clock, and that he was with Schooley and a Mr. Beebe; that Schooley closed the door so the witness would not hear their conversation. She further testified that Ball came back to his office on Friday morning about 8:45, and that he stayed all day except the lunch hour; that F. L. Smith was not there Friday morning, September 24th; that Schooley was not in his office between ten and twelve o'clock Friday morning, September 24th; that Ball stayed until four o'clock, when he said he was going to his club house on the river: that Schooley came in, and left when Ball left; that defendant telephoned to his office about 10:30 Saturday morning, September 25th, and said that he wanted to speak to Schooley. On cross-examination, she said she was married, but was not living with her husband: that he was in 'Mexico' at the time of the robbery, and in 'Virginia' at the time of the trial.

"The testimony of Fred Weingaertner, his wife, and Mrs. Ball tended to prove that on Friday, September 24, 1926, in the afternoon, they went to the defendant's club house near House Springs; that they stayed all night, and the next morning about 10:30 o'clock the defendant and Mr. Weingaertner took the defendant's Moon car and went to Mr. Boemler's to get some eggs and chickens; that they came back after awhile and said their car was stuck in the mud; that some time later, while they were in the house, F. L. Smith came to the door, and they could see that he had in his bosom quite a bit of money; that, when Smith came to the door with money on his person, he asked whether Schooley was there, and, when they told him that Schooley was not there, Smith left. They further testified that defendant Ball told them about noon on the day of the robbery, while they were at the club house, that Schooley was there and that he was in trouble, and defendant asked them to say, if anybody inquired about Schooley, that Schooley had come down to the club house with them Friday night.

"Defendant testified, in substance, that he was thirty-seven years old; that he was born in Jonesburg, Missouri; that during the month of September, 1926, he was running a county collection agency; that

he kept an office on Easton Avenue in St. Louis; that Roy Schooley officed with him; that at the request of Schooley, on Thursday, September 23, 1926, he took a fellow by the name of William Mack to Festus, Missouri, to see about buying some old Ford cars; that he stopped at the Citizens Bank of Festus and asked Mr. Porter, the cashier, about the residence of a fellow by the name of Martin; that he did not go into this bank for the purpose of making an inspection with the idea of robbery at a later time or that time; that he and Mr. Mack then went back to Wellston. Defendant testified further that Frank L. Smith was not in his (defendant's) office on Friday morning, September 24, 1926; that he did not have a conversation with Schooley and Smith and Allen in which Schooley stated that they intended to 'pull a job;' that he did not walk down stairs with Allen and get in his car and drive away, as Smith stated in his testimony; that none of the conversation which Smith testified about was had in defendant's office or any other place; that he and his wife and Fred Weingaertner and his wife went to their club house about six o'clock on Friday afternoon, September 24, 1926; that, when they got to the club house, they found that someone had broken into the same; that they stayed there that night, and the next morning, Saturday, September 25th, the day of the bank robbery, he and Fred Weingaertner went to Mr. Boemler's to get some eggs and chickens: that when they started back to the club house his (defendant's) Moon car got stuck in the mud. The defendant's further testimony as to what happened after he and Weingaertner got back to the club house was about the same as that that has already been related in the evidence of the defense heretofore stated. In substance, his testimony showed that when he got back to the club house someone drove up in a Nash automobile and took his boat and crossed the river; that, when he 'hollowed' at them, they told him to get back in the house.

"The State, in rebuttal, offered evidence to show that Mrs. Moss. while at the club house on the day of the robbery, said that Schooley was the man who stood in the lobby of the bank, and that Smith was not the man."

Other facts and circumstances developed at the trial will be referred to in the discussion of the questions presented for our consideration.

I. The information was vigorously attacked in the trial court, on the grounds of duplicity and insufficiency, by demurrer, motion to quash, plea in abatement, and motion to elect.

We do not agree with learned counsel in the contention that the information contains more than one count, nor that the pleader attempts to charge more than one offense. In substance, it alleges that the defendants Roy Schooley, John Doe, Richard Roe and Henry Roe robbed the bank, by charging them with

the actual assault and theft in question; that the defendants F. L. Smith, Francis T. Ball (this defendant) and Fred Weingaertner incited, moved, procured, aided, counseled and commanded said first named defendants (naming them) to commit said robbery; and that all of said defendants (naming all of them) ''in the manner and by the means aforesaid,'' did commit said robbery. Each and all of said acts are alleged to have been done willfully, unlawfully and feloniously, and all of said charges are embraced in one count, which covers every constitutive element of the crime of robbery in the first degree. [Sec. 3307, R. S. 1919.] Inasmuch as accessories before the fact may be charged, tried, convicted and punished in the same manner, as principals in the first degree, under the provisions of Section 3687, Revised Statutes 1919, and inasmuch as all of the defendants are so charged, that part of the information which also charges some of them as accessories before the fact may be treated as surplusage. So considered, the information sufficiently charges all of the defendants with robbery in the first degree, the offense for which this defendant was tried, and of which he was convicted. See, also, State v. Roderman, 297 Mo. 143, 148, 248 S. W. 964; State v. Wood, 285 S. W. 737.

II. Various complaints are made as to the admissibility of evidence offered by the State.

(a) When F. L. Smith, one of the original defendants in this case, took the witness stand for the State, defendant challenged his competency as a witness, on the ground that the venue in his case was not legally changed to the Circuit Court of Wayne County, where the State entered a *nolle prosequi,* and that, therefore, the order of *nolle prosequi* was void for want of jurisdiction of that court. Thereupon, the State offered in evidence a certified copy of the record of the Circuit Court of Wayne County, showing the entry of a voluntary *nolle prosequi* in Smith's case, and that court's order of Smith's discharge in pursuance thereof. Upon that showing, the court properly ruled that Smith was a competent witness in this case. [Sec. 4035, R. S. 1919.] It is elementary that the record of the Circuit Court of Wayne County imports, upon its face, jurisdiction of that court to make the order of *nolle prosequi* in Smith's case, and that this defendant cannot thus collaterally attack the jurisdiction of that court. However, there is no merit in defendant's contention that the order changing the venue in Smith's case from Jefferson County to Wayne County was void, on the ground that such order was made upon the agreement of the prosecuting attorney and Smith, as shown by the record in Smith's case. We have expressly held that, when the venue in a criminal case is changed by agreement, the court's order in pursuance of such agreement is not void, but merely involves an irregularity, of

which even the defendant himself cannot complain, because such order is made at his own request; and also, that even the defendant himself cannot complain of any irregularity, in connection with a change of venue, whether the question of waiver is involved or not, unless·he makes proper objection at the time the order is made and preserves his objection by a bill of exceptions filed in the court in which the order is made. [State v. Taylor, 132 Mo. 282, 286, 33 S. W. 1145; State v. Nave, 185 Mo. 125, 133, 84 S. W. 1.]

(b) It is contended that the court erred in admitting the evidence of the State relating to the finding of the bonds, money, three pistols and a sawed-off shotgun near the club house on the morning after the robbery, and in permitting the pistols and the shotgun to be exhibited at the trial and offered in evidence.

The identification of the bonds and the money found near the club house as the bonds and a part of the money which were taken from the bank by the robbers was eminently proper as proof that the alleged robbery was actually committed. The same may be said as to the three pistols and the sawed-off shotgun which were found at or near the same place and at the same time. It is undisputed that each of the three robbers, who entered the bank, carried a pistol. The cashier identified one of the three pistols found near the club house as his pistol, which was taken from the bank by the robbers. Smith testified that, when Schooley, Allen, Harry and Ernie got out of the Nash car at the club house, they had a gunny sack and a shotgun. He further testified that defendant told him to get some money for himself out of the sack, and that defendant had a tin box and told him there were bonds in the box. In view of this and other evidence as to what happened at the club house on the day of the robbery, the finding of the bonds, money, pistols and shotgun near the club house on the following morning, was a proper circumstance for the consideration of the jury, in determining who actually robbed the bank, and in determining the question of whether or not this defendant participated in the planning or the execution of the robbery. [16 C. J. 618, secs. 1222-1225; State v. Hart, 309 Mo. 77, 88, 274 S. W. 385; State v. Hopkins, 278 Mo. 388, 394, 213 S. W. 126; State v. Conley, 238 S. W. 804, 806.] It was held in the case of State v. Hart, supra, that, where a pistol had been properly referred to by witnesses in giving their testimony, the exhibition of such pistol at the trial and its admission in evidence were not prejudicial "because it was not of a character to excite either prejudice or passion." In view of the plain, undisputed facts of this case, the argument of defendant's counsel, in their brief, that the bonds, money and weapons may have been "planted" near the club house by detectives, cannot be seriously considered, as an argument against the admissibility of the evidence relating to the finding of the bonds, money, pistols and shotgun.

(c) Defendant further complains of the action of the trial court in permitting the cashier of the bank to testify that, since the robbery, he had seen the man who held him "up," and that his name is Harry Huffendieck; and also, in permitting the prosecuting attorney to testify that, since filing the information in this case, he had learned the true name of the defendant designated as John Doe in the information, and that his true name is Harry Huffendieck.

It is undisputed that three men entered the bank, carrying pistols, on the day of the robbery, and that one of them pointed a pistol at the cashier. If he could do so, it was entirely proper for the cashier to testify as to the names of any of the robbers; nor was it improper for him to testify that he had seen one of the robbers since the day of the robbery. All that occurred at the time and place of the robbery was a part of the res gestae, and, so far as the record shows, the identification of Harry Huffendieck by this witness was based upon what he saw at the time of the robbery, and not upon hearsay. [State v. Holmes, 289 S. W. 904, 907, and cases cited.] And we see nothing improper in permitting the prosecuting attorney, who signed and filed the information, to testify that, since filing the information, he had learned the true name of the defendant designated therein as John Doe, and that his true name is Harry Huffendieck. From his testimony, it seems that the prosecuting attorney knew the defendant whom he designated as John Doe in the information, but did not know his true name at the time the information was filed. His testimony was proper, therefore, for the purpose of informing the jury as to the true name of the defendant John Doe. Moreover, Smith testified that Harry Huffendieck was with him and Schooley and Allen and Ernie in the Nash car, when they drove from St. Louis to the club house on the morning of the robbery, and that Harry Huffendieck was with, Schooley and Allen and Ernie, when they came back to the club house in the Nash car after the robbery. With such other testimony in the case, defendant could not have been prejudiced by the testimony of the cashier or the prosecuting attorney, regardless of the propriety of their testimony.

III. It is also contended that the court erred in giving Instruction No. 2 of its own motion, and in the refusal of defendant's Instruction No. 3.

(a) The chief criticism of Instruction No. 2 is that, in such instruction, the court assumed that Harry Huffendieck and the defendant designated as John Doe in the information are one and the same person, by referring to Harry Huffendieck as "one Huffendieck, who is informed against in this case as John Doe." Such fact was established by the undisputed testimony of the prosecuting attorney, and it is not error for the court,

in its instructions, to assume the truth of a fact which is established by undisputed evidence. [State v. Carr, 256 S. W. 1043, 1047, and cases cited.] This instruction authorized a conviction upon the finding, in substance, that Roy Schooley and Harry Huffendieck did "feloniously, etc." commit the robbery, and that defendant did "feloniously procure, aid, incite, advise and encourage Roy Schooley or Harry Huffendieck, etc." to commit the robbery. It followed the information and the evidence, and correctly declared the law of the case. [State v. Roderman, *supra;* State v. Wood, *supra.*]

(b) By defendant's refused Instruction No. 3, it is declared, in substance, that there is no evidence tending to prove that defendant actually robbed the bank, or "that the defendant was present at said time and place and then and there aided, abetted or assisted in the robbery." Considering all of the facts and circumstances in evidence, which tend to show defendant's connection with the robbery. no error was committed by the court in refusing to instruct the jury that there was no evidence tending to show "that defendant then and there aided, abetted or assisted in the robbery." Furthermore, defendant was given the benefit of all or more than the evidence justified on this phase of the case, in his Instruction No. 4, by which the jury were told that there was no evidence tending to prove "that the defendant Francis T. Ball, on September 25, 1926, was actually present in person when the Citizens Bank of Festus was robbed."

IV. There can be no question about the sufficiency of the evidence in this case. According to the evidence produced by the State, defendant, Schooley, Allen and Smith met in the office of defendant and Schooley at Wellston on the morning of September 24, 1926, and agreed to "pull a job." Defendant and Allen volunteered to go down and look the "jug" over (meaning the bank). Defendant and Allen went to a garage, and, later that morning, about 11:30, defendant visited the Citizens Bank of Festus, talked to the cashier about a Mr. Martin, and gave the cashier a business card of William *Mack* of St. Louis. About eight o'clock that evening, Allen notified Smith to be at the garage at six o'clock the next morning. Smith met Harry Huffendieck at the garage the next morning, September 25, 1926. They "picked up" Schooley, Allen and Ernie, and drove to the club house in the Nash car. Smith got out of the car at the club house, and Schooley, Huffendieck, Allen and Ernie continued on their journey. The man whom Smith knew by the name of Allen was called *"Mac"* by the other men in the car. When Schooley, Huffendieck, Allen and Ernie returned to the club house, they had a gunny sack and a shotgun. They were followed to the club house by officers and other citizens, and Schooley exchanged shots with a deputy sheriff and two other men who joined in the chase. Huffendieck, Allen and Ernie crossed

the river in defendant's boat before the officers reached the club house, and defendant attempted, by false statements, to mislead the officers as to what had happened before their arrival, and as to when Schooley came to the club house. Defendant, Schooley and Smith were arrested at the club house in the afternoon or evening of that day. The next morning, the bonds, some of the money, and the cashier's pistol, which the robbers had taken from the bank, were found near the club house; also two other pistols and a shotgun. Before their arrest, defendant told Smith to help himself to some of the money in the sack, and also that there were bonds in the tin box which he (defendant) had under his arm. Schooley and Huffendieck were positively identified as two of the robbers who entered the bank. A third robber entered the bank with Schooley and Huffendieck, and another man got in the Nash car with them when they left. This evidence clearly tends to show that defendant conspired with Schooley, Allen and Smith to rob the bank in question and that he aided and abetted them in planning the robbery. It also tends to show that Schooley and Allen were two of the men who actually committed the robbery. Under the law, the acts of Schooley and Allen are the acts of defendant. [Sec. 3687, R. S. 1919.] The testimony of the accomplice (Smith) is strongly corroborated by other evidence in the case. Moreover, defendant admitted that he and William *Mack* made a trip to Festus on September 23, 1926, and that he (defendant) visited the bank on that day. He also admitted that he made a false statement to the officers, as to when Schooley came to the club house, after he knew Schooley was "in trouble." Obviously, the jury were not favorably impressed with the defense of *alibi* on the issue of conspiracy, and, as we have already indicated, there is substantial evidence to support their finding on that issue. The demurrers to the evidence were properly overruled. [State v. Glon, 253 S. W. 364; State v. Roderman, supra; State v. Wood, supra.]

V. It is seriously urged that the prosecuting attorney made improper and prejudicial remarks in his argument to the jury. Concerning this matter, the record reads as follows:

"Thereupon and during the argument of counsel for the State, Mr. McCormack, the following occurred:

"Mr. McCormack: Gentlemen, the court has instructed you that you may take into consideration the character and demeanor of the witness on the witness stand. Did you notice Mrs. Martin on the witness stand yesterday afternoon and did you notice and observe the stains on her fingers? Gentlemen, that shows the kind of woman she is.

"Mr. Rosenberger: I object to that statement of the prosecuting attorney. It is unfair and insinuates something against this woman that hasn't been proved in any way, in connection with this case. That statement is highly inflammable and prejudicial to the rights of this defendant, before the jury, and I ask that the prosecuting attorney be reprimanded by the court for making that statement.

"The Court: I see nothing wrong about that statement. The objection will be overruled.

"To which action of the court, in overruling said objection and refusing to reprimand the prosecuting attorney, counsel for defendant then and there at the time, duly objected and excepted."

It does not appear, on the record, whether the remarks complained of were made in the opening or closing argument for the State, and, therefore, we are not advised as to whether defendant's counsel had an opportunity to reply to these remarks. Nor do the remarks of the prosecuting attorney show precisely what he intended to infer as the cause of the stains on the fingers of the witness. Counsel for defendant say he intended to insinuate that the lady had been smoking cigarettes, and by that insinuation intended to attack her credibility. Conceding that such was the purpose and intention of the prosecuting attorney, in making these remarks, it must be remembered that the jury have the right to consider the appearance, conduct and demeanor of witnesses, while on the witness stand, in passing upon their credibility and in determining the weight and value to be given to their testimony. And, considering the right of counsel, in their arguments to the jury, to comment on such matters, and to draw reasonable inferences therefrom, we are not inclined to say that the remarks in question were entirely improper, nor that the court erred in overruling defendant's objection thereto. But, even though improper, when considered in connection with the nature of the case and all of the facts and circumstances in evidence, we do not think that these remarks had any prejudicial effect on the jury. [See State v. Harmon, 296 S. W. 397, 400, and cases cited.]

We find no merit in the other complaints of defendant, and our examination of the whole record satisfies us that he was given a fair and impartial trial. The judgment is accordingly affirmed. *Higbee* and *Davis, CC.,* concur.

PER CURIAM:—The foregoing opinion by HENWOOD, C., is adopted as the opinion of the court. All of the judges concur.