THE STATE v. JOHN PEPE, Appellant.—46 S. W. (2d) 862.

Division Two, February 17, 1932.

*Howard Sidener* and *Verne Lacy* for appellant.

776

*Stratton Shartel,* Attorney-General, *Don Purteet,* Assistant Attorney-General, for respondent.

HENWOOD, J.—By an indictment filed in the Circuit Court of St. Louis County, the defendant and Claude Gillman and Joseph Sinovich were jointly charged (under Sec. 4021, R. S. 1929) with kidnapping one Jacob Hoffman. Severances were taken, and at a separate trial the defendant was found guilty and his punishment assessed at imprisonment in the penitentiary for five years. He was sentenced accordingly and appealed. Gillman and Sinovich were convicted at separate trials and sentenced to imprisonment in the penitentiary for ten years and two years, respectively. Their separate appeals were submitted at the October term, 1931, of this court, and the judgments entered against them have been affirmed. [State v. Gillman, 44 S. W. (2d) 146; State v. Sinovich, 329 Mo. 909, 46 S. W. (2d) 877.]

Jacob Hoffman, the victim of the alleged offense, testified, in substance, as follows: He conducted a cigar store at 112 North Broadway in the city of St. Louis. His office was on the second floor of the same building. About 6:30 or seven o'clock in the evening of Tuesday, February 18, 1930, while he and four other men were in the office, three men entered the office, each brandishing an automatic pistol and each masked with a handkerchief. These three men "robbed" him, placed taped glasses over his eyes, led him down the stairway to the street, and put him in the back seat of an automobile. Two of these men got in the back seat with him, one on each side of him, and the other got in the front seat with the driver of the automobile. The driver was seated behind the steering wheel, ready to start the automobile, when he (Hoffman) and the other three men entered it. The automobile was driven north to the first street corner, then west to the next street corner, then south, for thirty or forty-five minutes, to a house, "off of the hard roads," where these men removed the taped glasses from his eyes, blindfolded him with a bandage, told him he "was held," and kept him, as a prisoner, that night and the next day. The second night, Wednesday, February 19, he was taken in an automobile, after a drive of twenty or thirty minutes, to another house, where he was kept that night and the next day. Two men stayed in the room he was in that night, and one of the men "slept" with him. The third night, Thursday, February 20, he was taken in an automobile, after a drive of an hour, to a small room in the cellar of another house. Three men rode with him in the automobile on the trip to this house, and these three men were assisted by one or two other men in moving a bed and some other things into the cellar of this house. The bed was placed in the small room for his use that night. There was an opening in the partition between the small room and an adjoining room in the cellar,

but no door at the opening. He was given some bread and coffee that night. The man who brought the bread and coffee to him told him he could remove his blindfold while he ate his lunch, but not until "he [the man] had gotten out" of the room. With his blindfold removed, he observed that the only window in the room was covered, and that the room was very dark. He heard men talking in the adjoining room that night. Some ham and eggs and coffee were brought to him about eight o'clock the next morning. Between ten and eleven o'clock that morning, he heard officers knocking and kicking on the cellar door, and heard an officer say, "Come out of there." Thereupon, he removed his blindfold, and shouted, "I am Hoffman, I am coming with my hands up." One of the officers grabbed him and took him out of the cellar into the yard. He saw some of the officers taking Gillman out of the cellar. He saw the defendant out in the yard, where some of the officers "had him." He was blindfolded from Tuesday evening, February 18, when he was taken from his office, until Friday morning, February 21, when he was released from captivity by the officers, except while eating his lunch in the cellar Thursday night, and throughout this period he was held against his will.

The sheriff of St. Louis County and two of his deputies and about twenty police officers of the city of St. Louis participated in the search which resulted in the release of Hoffman and the arrest of the defendant and Gillman. The sheriff and eight of these police officers were called as witnesses for the State. From their testimony, we gather the following: The cellar in which Hoffman and the defendant and Gillman were found was a part of the house occupied by Joseph Sinovich and his family as their home. It was a two-story brick house on Bayless Avenue, in St. Louis County. The house faced the south, and there was a porch on the north or rear part of the house which extended from the east to the west side of the house. Under the porch was an areaway, and the space between the floor of the porch and the ground was enclosed with lattice work. There was an entrance to the areaway on the west side, consisting of drop doors and a stairway, and another entrance to the areaway on the north side, near the northeast corner of the porch. The cellar was divided into east-and-west sections by a rock wall. Doors in the cellar wall afforded an entrance to each section of the cellar from the areaway, and there was a stairway from the first floor of the house to the east section of the cellar. The west section of the cellar consisted of two rooms. The north room was about ten feet by twelve feet in size, and the south room about five or six feet by ten feet in size. The south room, apparently intended as a coal bin, was formed by a wooden partition which extended from the middle wall of the cellar to the west wall. An opening, about three feet wide, in the

wooden partition, furnished a passageway between these two rooms. The search of Sinovich's premises began between ten and eleven o'clock Friday morning, February 21. The sheriff and some of the other officers entered the areaway at the north or rear part of the house by raising the drop doors on the west side of the areaway and going down the stairway at that point. The door to the west section of the cellar was locked or barricaded on the inside. The sheriff knocked on this door and announced that "officers" wanted to enter the cellar. Getting no response from the inside, he "kicked it [the door] open about fourteen inches or so." He "made one or two steps inside and ran into Pepe [the defendant]." One of the other officers "took charge" of the defendant, and the sheriff shouted, "police officers, stick em up." Hoffman replied, "I am coming out with my hands up," and as the sheriff took another step or two he "bumped into Hoffman." About that time another officer "ran into Gillman." The sheriff shouted, "I have got Hoffman," and another officer announced that "he had Gillman." The windows in this (the west) section of the cellar, in both rooms, were covered with heavy wrapping paper, and it was very dark in both rooms. In the south room or small room, there was a small iron bed, and on a box, near the bed, were some dishes. In the north room or larger room, there were several barrels and boxes, some dishes on one of these boxes, two folding chairs near the passageway into the south or small room, "two 45 automatic pistols—fully loaded" on the top of a barrel, near the folding chairs, and "a 45 automatic—fully loaded" on the top of another barrel, near the folding chairs. Neither the defendant nor Gillman had on a hat or cap when they were found by the officers in the cellar.

Three automatic pistols were produced at the trial, identified as the pistols found in the cellar, and admitted in evidence on behalf of the State.

The defendant, testifying in his own behalf, said: He was 25 years of age, and lived with his parents and sisters and brothers at 320 Plum Street in the city of St. Louis. He met his friend Lester Fastnet at the corner of Broadway and Market Street in the city of St. Louis, a day or two before February 21, 1930, and asked Fastnet where he (the defendant) could find a job. He talked to Fastnet over the telephone in the evening of February 20, about a job. About ten o'clock Friday morning, February 21, he talked to Fastnet at 704 Lemay Ferry Road, where Fastnet conducted a drug store, and at the suggestion of Fastnet he went to the home of Joseph Sinovich, near Fastnet's drug store, to ask for a job. He entered the back porch and knocked on the kitchen door, but got no response. He entered the kitchen, and a man told him he would find Sinovich downstairs. He went down the stairway into the east section of the cel-

lar, but found no one there. He went into the areaway adjoining the cellar, and when he reached the door to the west section of the cellar he heard a noise inside. He opened the door, stepped inside, and somebody said, ''Close the door.'' He asked, ''Is Joe there?'', and somebody said, ''No, he is not here, close the door, he will be here in a minute, stay where you are at.'' In about four or five minutes, the officers entered the cellar and arrested him. He did not know Sinovich or Gillman prior to that time. He had nothing to do with the kidnapping of Hoffman, nor did he know anything about it. On cross-examination, he said he had no business, and had not been employed, except at odd jobs, for six or seven months. He also said he had a hat on when he was arrested by the officers in the cellar, and that the officers ''shook'' him and ''knocked it off'' of his head.

The testimony of the defendant's witness Lester Fastnet corroborates the testimony of the defendant as to their conversations a day or two before February 21, in the evening of February 20, and in the morning of February 21. Three other witnesses for the defendant, including Henry Denero, testified that the defendant visited in the home of Henry Denero, at ''4113a Lafayette,'' from 6:30 to 9:30 o'clock in the evening of February 18. One of the defendant's sisters testified that he came home about ten o'clock on the night of February 18. Another of his sisters testified that she saw the defendant at home about 7:15 o'clock in the morning of February 21. The defendant's father testified that the defendant ate breakfast at home about 6:45 o'clock in the mornings of February 19 and 21.

I. It is contended that the trial court erred in admitting in evidence the three automatic pistols.

There is no merit in this contention. Hoffman testified that each of the three men who seized him and took him from his office was carrying an automatic pistol, and, according to the testimony of the police officers, the three automatic pistols exhibited at the trial and two men (the defendant and Gillman) were found in the cellar of Sinovich's house, in close proximity to the room in which Hoffman was confined. These pistols were clearly admissible as corroborative proof of the *corpus delicti*, that is, in corroboration of the proof that Hoffman was forcibly seized and secretly confined against his will. [See our ruling to the same effect in Gillman's case; see, also, State v. Ball, 321 Mo. 1171, 14 S. W. (2d) 638, and cases cited.]

II. It is further contended that the evidence is not sufficient to sustain the conviction of the defendant.

Section 4021, Revised Statutes 1929, says:

''If any person shall, willfully and without lawful au-

thority, forcibly seize, confine, inveigle, decoy or kidnap any person, with intent to cause such person to be sent or taken out of this State, or to be secretly confined within the same against his will, or shall forcibly carry or send such person out of this State against his will, he shall, upon conviction, be punished by imprisonment in the penitentiary not exceeding ten years. Any person charged with such offense may be tried in any county into or through which the person so seized, inveigled, decoyed or kidnapped shall have been taken, carried or brought.''

From undisputed evidence adduced by the State, it appears that, about 6:30 or seven o'clock in the evening of February 18, 1930, Hoffman was forcibly seized and taken from his office, in the city of St. Louis, by three men carrying automatic pistols; that, from that time until the morning of February 21, he was secretly confined against his will; that, from the evening of February 20 until the morning of February 21, he was so confined in a small room in the west section of Sinovich's house, in St. Louis County; that, in the morning of February 21, when he was found and released from confinement by the police officers, the defendant and Gillman and three automatic pistols were found in the same section of the cellar and in the room adjoining the room in which Hoffman was confined; that the door to said section of the cellar was locked or barricaded; and that it was necessary for the police officers to crash the door in order to enter the room in which the defendant and Gillman were found. From this and other evidence, the jury were warranted in inferring that the three men who forcibly seized Hoffman at his office were the men who caused him to be secretly confined against his will, and that the defendant was one of these men. Obviously the jury were not favorably impressed with the defendant's explanation as to how he happened to be found in the cellar in which Hoffman was confined, or with the testimony of the defendant's relatives and friends in support of his defense of *alibi*. It was the peculiar province of the jury to settle all issues of fact, and the evidence is sufficient to support their verdict. The conviction of the Gillman, which we have heretofore upheld, rests on substantially the same evidence as the evidence in this case.

III. It is finally contended that the trial court failed to instruct the jury on all questions of law arising in the case.

As we read and understand the defendant's brief, the complaints now made with reference to the giving of instructions were not ''set forth in detail and with particularity'' in the motion for a new trial, and, therefore, such complaints are not proper subjects for our consideration. [Sec. 3735, R. S. 1929; State v. Standifer, 316 Mo. 49, 289 S. W. 856.] However, our review of the record discloses that

the given instructions covered all rules of law involved in the case, including the rules relating to circumstantial evidence and the defense of *alibi*.

The indictment and the verdict are in approved form, and we are satisfied that the defendant was accorded a fair and impartial trial.

The judgment is affirmed. All concur.